JOHN T. GORMAN
Federal Public Defender

BRIANA E. KOTTKE
Assistant Federal Public Defender
First Hawaiian Bank Building
400 Route 8, Suite 501
Mongmong, Guam 96910
Telephone: (671) 472-7111

Attorney for Ricky James Jr. Salas Santos

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 20-00021 |
| | ) | |
| Plaintiff, | ) | REPLY RE: MOTION TO |
| vs. | ) | COMPEL DISCOVERY |
| | ) | |
| | ) | |
| RICKY JAMES JR. SALAS SANTOS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Ricky James Jr. Salas Santos, through counsel, respectfully files this Reply to the government's Response to his Motion to Compel Discovery and reasserts his request for a hearing on this motion before Chief Judge Tydingco-Gatewood.

I. **Notes of Officers, Missing Reports, and Policies and Procedures**

A. **Notes**

The Ninth Circuit, other federal courts, and this Court have long made clear that original, handwritten, or rough notes "must be preserved" and are potentially discoverable. *United States v. Harris*, 543 F.2d 1247, 1248 (9th Cir. 1976); *see also United States v. Harrison*, 524 F.2d 421 (D.C. Cir. 1975); *United States v. Johnson*, 521 F.2d 1318 (9th Cir. 1975); *United States v. Lewis*, 511 F.2d 798 (D.C. Cir. 1975); *United*

*States v. Carrasco*, 537 F.2d 372 (9th Cir. 1976). In fact, Guam's LOCAL CRIMINAL RULES *require* the government to admonish its officers and agents to preserve their notes. CRLR 16(b)(2)(D).

*United States v. Harris* is the seminal case in the Ninth Circuit regarding the requirement for officers and agents to preserve rough notes. In *Harris*, an FBI agent made rough notes during his interview with Harris. The agent then drafted a 302 Report (FBI police report) and destroyed his rough notes per FBI policy. At trial, the FBI agent's testimony contradicted the testimony of other witnesses, including Harris, about the timing of dispositive events. In addition, the recollections the FBI agent attributed to Harris also differed from the testimony of other witnesses and Harris. The Ninth Circuit confirmed that rough notes are to be preserved by agents, even when destroyed in good-faith compliance with internal policies, because the rough notes are potentially discoverable and can be considered "statements" under the Jencks Act.

> The only issue raised in this appeal is the propriety of the long-standing administrative practice of the Federal Bureau of Investigation (FBI) of routinely destroying rough interview notes taken by agents in the course of a criminal investigation after the information contained in the notes is incorporated in a more formal interview report. We reject the contention of the government that the good-faith destruction of rough notes in accordance with normal agency procedure is justifiable. Notes taken by FBI agents in interviews either with prospective government witnesses or, as in this case, with the accused, constitute potentially discoverable materials . . . . Since the routine disposal of potentially producible materials by the FBI amounts to a usurpation of the judicial function of determining what evidence must be produced in a criminal case, we hold that such original or rough interview notes must be preserved.

*Harris*, 543 F.2d at 1247-1248 (internal citations omitted).

2

The need for the preservation of notes is clear, especially when the reports that are made from the officers' recollections contain mistakes and inconsistencies, as is the case here. *See e.g.* MOT. TO COMPEL, ECF 50 at 9-14, 17-19. "Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis [in the Jencks Act] on 'substantially verbatim recital,' and 'continuous, narrative statements made by the witness recorded verbatim, or nearly so . . . ,' that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report . . . ." *Carassco*, 537 F.2d at 375-376 (quoting *Palermo v. United States*, 360 U.S. 343 (1959)).

The inconsistencies in the reports and 302 drafted by agents in this case raise more questions than their "corrections" are able to answer. *See* MOT. TO COMPEL, ECF 50. This is especially true because these corrections, clarifications, and additions came after Ricky's attorney began requesting additional reports, chain of custody records, and missing evidence. The reason retention and production of the rough notes of the agents is so important is because "the only solid evidence a defendant could offer to show either bad faith or failure to transfer all data would come from producing the notes themselves exactly the course he cannot pursue because of the agency's practice [of destroying notes]." *Harris*, 543 F.2d at 1251-1252 (quoting *Harrison*, 524 F.2d at 431-432).

As stated by the government, documents generated by law enforcement are in

the prosecution's custody and control when that law enforcement agency was used as part of the government's investigation and prosecution of the defendant. GOV.'S RESP. at 10, ECF 56 (citing *United States v. Fort*, 478 F.3d 1099, 1102 (9th Cir. 2007)). Therefore any rough, handwritten, or original notes made by the investigating officers and agents in this case are in fact in the control and custody of the government. These rough notes must be produced.

B. **Reports and Policies and Procedures**

The above-argument assumes that the officers and agents actually wrote rough notes during the course of their investigation. The danger in failing to take appropriate notes during an investigation, especially a surveillance operation, is that an officer may "adapt a final report" or "tailor his [unrecorded] observations to fit his conclusion." *See Carrasco*, 537 F.2d at 377. That appears to be happening in this case where one agent changed his recollection of the color of Ricky's shirt in order to match the recollections of the other officers. It is an extremely unusual situation for an agent to make such a change to his or her report.

To help try to determine whether the officers here acted in bad faith in failing to produce exculpatory evidence until after the defense specifically requested missing reports, it is essential to know what is expected of the agents and officers during the course of an investigation. If the policies require that agents take and preserve notes, yet the agents failed to do so in violation of those policies, this would certainly be impeachment evidence and perhaps evidence of bad faith. At worst, it could show an

2

active attempt to hide exculpatory or impeachment evidence simply by declining to document what actually occurred in violation of office policy.

After defense counsel asked the agents about missing records, they mysteriously produced additional reports and corrections written well after the events, and these reports contained exculpatory evidence (i.e. no clue spray found on Ricky despite clue spray being put in the box Ricky is alleged to have opened, *inter alia*). Why was that report produced only after Ricky's counsel requested evidence supporting Ricky's contention that two separate clue spay searches were completed and that no clue spray was found during either search of his person? Do the policies and procedure require information like this to be reduced into a report? Where are the missing reports of other involved officers? *See* MOT. TO COMPEL, ECF 50 at 14.

*Brady* and its progeny require disclosure of this type of evidence. Because of the fundamental legal requirement for disclosure of *Brady* evidence, it is very likely that applicable law enforcement policies and procedures set out expectations for the preservation of such exculpatory evidence. After all, the agent who conducted the clue spray searches, TFO Calvo, has still not produced a record of this event, and it is unclear why that is. Rather, his supervisor Agent Correa wrote a report based on what Officer Calvo allegedly told him about the searches of Ricky's person, well after the fact. While it does confirm that Ricky's recollection of this event is accurate, the omission of the clue spray search followed by a report generated by someone else raises more questions than it answers.

3

The government's arguments against production of these policies and procedures are without merit. It argues that release of these various policies and procedures to the defense would endanger agents and confidential sources in the field and present an unacceptable risk that the information contained therein will be disseminated. *See* GOV.'S RESP., ECF 56 at 11-13. This is a 'flood-gates' argument that is inapplicable to this situation. In addition, any fear of disclosure can be mitigated with a simple protective order preventing disclosure. The government's fears are unfounded, but Ricky's right to determine whether bad faith is involved is not.

## II. <u>Chain of Custody Documents</u>

The government refers to bates RSANTOS-00316 to RSANTOS-00348 as containing the chain of custody for each exhibit. However, these are police reports and not chain of custody documents. An example of this faux chain of custody can be seen on page 17 of the MOTION TO COMPEL in the box at the bottom. Ricky is entitled to the actual chain of custody, not a mere reference thereto. Without the chain of custody, the integrity of all of the evidence in this case is called into question.

## III. Conclusion

Ricky respectfully requests a hearing and an order compelling the government to provide the following items:

(1) Handwritten, rough and/or field notes of all officers/agents involved in the investigation;

(2) Copies of policies of procedures relating to drafting reports, drafting records, and otherwise preserving surveillance efforts and actions taken during the

4

investigation and arrest of a suspect from all agencies involved in this investigation, including but not limited to: USPIS, DEA, GPD, HSI, and any separate rules or procedures relating to task force officers of the above-entities;

(3) Missing reports on all areas of the investigation;

(4) *Brady*, *Giglio*, and *Henthorn* materials of all government witnesses and law enforcement including but not limited to: David Elliott, Henry James, Jan Dizon, Jeremiah Cruz, Jason Correa, Shaw Ayuyu, and Erwin Fejeran;

(5) Any and all materials, reports, surveillance, witness statements, and confidential informant statements, relating to the investigation of any other individual or individual(s), including Ricky's family, suspected in this investigation;

(6) All licenses and necessary certifications on the Celebrite or other software used to image or review phones seized during the investigation; and

(7) All chain of custody documents and evidence logs from all evidence collected during the investigation.

DATED: Mongmong, Guam, March 24, 2021.

/s/



Attorney for Ricky James Jr. Salas Santos

5